## DANKS vs. QUACKENBUSH.

The judgment of the Supreme Court in this case, determining that the act to extend the exemption of personal property from sale under execution, passed April 11, 1842, is unconstitutional and void as to debts contracted before its passage, *affirmed*.

On error from the Supreme Court. Danks sued Quackenbush in the Common Pleas of Onondaga County, in replevin for taking a horse and harness. The case was this:

In January, 1837, one Fitch recovered judgment against Danks in the Supreme Court, in an action upon contract, for $83 85. In January, 1843, an *alias fieri facias* was issued on the judgment, and delivered to Quackenbush, who was a Deputy Sheriff, and who took the property in question by virtue of the execution; and for that taking the suit was brought. On the trial Danks claimed that the property was exempt from execution by the act of 1842, which enacts that, "in addition to the articles now exempt by law from distress for rent or levy and sale under execution, there shall be exempted from such distress and levy and sale, necessary household furniture, and working tools, and team owned by any person being a householder, or having a family for whom he provides,

17

to the value of not exceeding one hundred and fifty dollars."
(*Laws of* 1842, *p.* 193.)   The necessary facts were shewn on
the trial to bring the property in question within the exemp-
tion declared by this statute, provided the statute was to be so
construed as to apply to debts contracted before its passage,
and if such was the construction, then provided it was a con-
stitutional and valid statute as to debts of that description.
The defendant insisted that it did not apply to pre-existing
contracts, and if it did, that it was so far unconstitutional and
void.   The Court charged the jury that the property was ex-
empt, and the jury accordingly found a verdict for the plain-
tiff, on which judgment was rendered in his favor in the
Common Pleas.   Quackenbush having made a bill of excep-
tion embracing the above questions, removed the judgment
by writ of error into the Supreme Court, where the the judg-
ment was reversed upon the ground that the act in question
was unconstitutional and void as to antecedent contracts.
(*See* 1 *Denio,* 128, *where the opinion of the Supreme Court is
given at length.*)

A record of reversal being made up, Danks now brings
error to this Court.

*A. Taber,* for plaintiff in error.

I. The statute in question makes no exception of executions
for debts which had been *previously* contracted, and was evi-
dently intended by the Legislature to apply to all executions
levied after it went into effect. (*Sackett* vs. *Andross* 5 *Hill.* 334.)

II. Before the Court will declare an Act of the Legislature
unconstitutional, a case must be presented in which there is
no rational doubt. (*Dartmouth College* vs. *Woodward,* 4
*Wheaton's Rep.,* 625 ; *Exparte, McCollum,* 1 *Cow. Rep.* 550.)

III. The statute in question is not a "Law impairing the
obligation of contracts," within the meaning of the Constitu-
tion of the United States. (*Bronson* vs. *Kinzie,* 1 *Howard*

Danks *v.* Quackenbush.

311; *McCracken* vs. *Hayward*, 2 *Do.* 608; *Sturges vs. Crown-ingshield*, 4 *Wheat*, 122.)

*Geo. F. Comstock,* for defendant in error.

I. The Act of 1842, extending the exemption of property from execution, cannot, consistently with settled rules, be so construed and applied as to affect pre-existing contracts. (*Gillmore* vs. *Shuter*, 1 *Freeman* 466. *S. C.* 2 *Mod.* 310; *Couch* vs. *Jeffries*, 4 *Burr.* 2460; 6 *Bac. Abr.* 370; 2 *Atk.* 36; 1 *Vesey, Sen.* 225; 2 *Ld. Raymond* 1350; *Osborn* vs. *Huger*, 1 *Bay Rep.* 179; *Ham.* vs. *Claws*, *ib.* 93; *Dash* vs. *Van Kleeck*, 7 *Johns* 477; *Sackett* vs. *Andross*, 5 *Hill* 334, 7 *and* 362, 5.)

II. The Act in question under a retrospective construction, is in violation of that provision of the Constitution of the United States which prohibits the State Legislatures from passing laws impairing the obligation of contracts and is therefore void. (*Sturges* vs. *Crowningshield*, 4 *Wheat.* 122; *Green* vs. *Biddle*, 8 *do.* 1; *Mason* vs. *Haille*, 12 *do.* 370, 318, 337; *Bronson* vs. *Kinzie*, 1 *Howard* 311; *McCracken* vs. *Hayward*, 2 *do.* 608; 1 *Car. Law Repos.* 385; 2 *do.* 428; 7 *Monr.* 11; *do.* 544; *do.* 588; 4 *Litt.* 34; *do.* 53; 5 *Monr.* 98.)

After advisement, JEWETT, CH. J. and BRONSON, RUGGLES and GRAY, Js., were for affirming the judgment of the Supreme Court, upon the ground stated in the opinion of that Court.

GARDINER, J. (dissenting). The decision of the Supreme Court will be affirmed, (upon an equal division of the members of this Court) as I understand, upon the ground exclusively, that the exemption act of 1842, under a retrospective construction, is in violation of that provision of the Constitution of the United States, which prohibits the States from passing any law impairing the obligation of contracts.

The law in question is as follows: " In addition to the articles now exempt, there shall be exempted from distress and

levy and sale, necessary household furniture, and working tools, and team owned by any person being a householder, or having a family for which he provides, to the value of not exceeding one hundred and fifty dollars; provided that such exemption shall not extend to any execution issued on any demand for the purchase money of such furniture, or tools, or team, or articles enumerated by law."

The jury have found that the property levied upon was *necessary* for the support of the plaintiff's family, and exempt from execution, if the statute is obligatory upon the defendant.

This is the only question I shall consider. The principle involved is both delicate and important. It has received the deliberate attention of the Supreme Court who have vindicated their judgment in an opinion of unusual ability; and it would seem to be required of those who cannot acquiesce in a decision which will be adopted by this Court, to state the grounds of their dissent.

According to the decisions of the Supreme Court of the United States, the several States may impair the obligation of contracts, First, by laws which annul, modify, or alter the contract itself. (*Story Comm.* § 1379 *Ogden* vs. *Saunders* 12 *Wheat.* 284 ; 4 *Wheat.* 197–8.) Secondly, by those which change the effect given by the existing law to the *terms* of the contract, which by some Judges is denominated the *law* of the contract. (*Story Comm,* § 1378 *page* 249 ; 4 *Wheat.* 341–2 ; 1*st Howard* 375 ; 1 *Howard* 319.) An example of this kind will be found in Kinzie *vs.* Bronson, and would be furnished in this State, by a mortgage of real property, which should contain only a description of the premises, the sum secured, time of payment, and names of the parties: It is obvious that in the instance supposed the right and interest of the mortgagor and mortgagee in the premises, would have to be gathered from the existing law, in reference to which this contract was made, and which in these respects, it would tacitly adopt. Bills of exchange, furnish another example. Although the day of payment may be fixed by the instrument,

Danks *v.* Quackenbush.

the payee is entitled to the days of grace allowed, which thus becomes the law of the contract.

The *law* of the contract, must not be confounded with the *remedy* to enforce it. The first, says Judge Washington in Ogden vs. Saunders, " remains the same every where and will " be the same in every tribunal.  But the remedy necessarily " varies ; and with it the effect of the constitutional pledge, " which can only have relation to the laws of each State " severally."

Indeed, the distinction betweeen the contract, and the law of the contract is rather formal than substantial. · The first, according to the spirit of the authorities, applies where the parties have defined their obligations and duties in express terms.  The second, to those cases where the agreement is incomplete, and frequently unintelligible in these respects without the aid of the law, which in the language of Judge Story, " performs the office only of expressing what is tacitly admitted by the parties to be a part of their intention." (*Story Com. Chap.* 34, § 1378.)

In the third place, the obligation of a contract may be impaired by a law " denying a remedy altogether, or may be " seriously impaired by burdening the proceedings with new " conditions and restrictions, so as to make the remedy hardly " worth pursuing."   This is somewhat indefinite ; but it is the language of Chief Justice Taney, and as precise probably as the nature of the subject will permit.

These are the only modes in which, the obligations of a contract can be assailed by State legislation.  The law must act upon the contract, or upon the remedy.

There is, however, a broad and well defined distinction, between the authority of the State in the two cases.  A State can pass no law the effect of which will be to vary the contract.  No benefit to the people, no supposed advantage to the parties will authorize it.  The manner and degree in which the change is effected, can in no respect influence the conclusion. (*Story Com.* 3 *Vol.* § 1379.)  The power is want-

ing, for the prohibition of the constitution is absolute and universal.

It is just as firmly settled by authority, that the states retain their power over the remedy; they may change or modify that at pleasure. "No one," says Judge Story, "will doubt "that the Legislature may vary the nature and *extent* of reme- "dies, so always that some substantial remedy exists." (*Story Com.* § 1379.) In Kinzie *vs.* Bronson, (3 *Howard* 315,) the Court remark, "that undoubtedly a State may regulate at "pleasure the mode of proceeding in its Courts, in relation to "past contracts as well as future. And although a new reme- "dy may be deemed less convenient, and render the recovery "of debts more tardy and difficult, yet it does not follow that "the law is unconstitutional. Whatever belongs to the reme- "dy may be altered according to the will of the State, pro- "vided the alteration does not impair the obligation of the "contract." And what the legislation must be to procure this result, he has told us in the language I have already quoted.

In McCracken *vs.* Hayward, Judge Baldwin remarks, that it must not be understood by that or any other decision of the Court, that all State legislation upon existing contracts is repugnant to the constitution. And he instances the recording acts, by which an elder is postponed to a younger grantee, the statute of limitations, and he might have added, the laws abolishing imprisonment for debt, a remedy coeval with, and the most stringent known to, the common law. Sufficient has been said upon this distinction between the contract and the remedy, a distinction which, according to Judge Marshall, (*Sturges* vs. *Crowningshield*, 4 *Wheat.* 200,) exists in the nature of things, and is recognized in every decision in the United States Courts upon this clause in the constitution.

In the light of these principles, I proceed to examine the law of the State of New York.

And in the first place, it is not repugnant to the constitution because it changes or acts upon the *contract* between the parties; or the *law* of the contract. It does not inter-

fere with the terms of their agreement, whatever they might be. or the effect which the law existing at the time when it was made gave to them.

Indeed, a conclusive answer to any such pretence is, that we know nothing of the terms of this contract. The record states that the judgment was rendered upon a contract. Of its provisions, whether it was made here, or in a foreign country, we have no information whatever.

We know indeed that the judgment record was before the Court; that the Judge was required to charge that the law was unconstitutional, and refused. We might perhaps indulge a presumption in order to *sustain* the decision, we cannot infer *any fact* not stated, in order to *reverse* it.

I assume it therefore as unquestionable, that if the law of this State is obnoxious to the constitutional objection, it is because it impairs the obligation of the contract by striking at the remedy. " That it presents a case within the undoubted " power of State legislation, but that its provisions are so un- " reasonable as to amount to the denial of a right, and to call " for the interposition of the Court." (*Baldwin J.* 2 *Howard* 613.) So that we can say with C. J. Taney, (1 *Howard* 317) that " it has burdened the remedy with new conditions and restrictions, so as to render it hardly worth pursuing." Or with Justice Story, " that it leaves to creditors no substantial remedy whatever." In short the enquiry is not as to the existence, but the abuse of legislative power.

If this view of the question is correct, it is believed that the decision of the Supreme Court ought not to be sustained. No reliance is placed by that Court upon the fact that the plaintiff's judgment was recovered prior to the Law of 1842. Nor is the circumstance of any importance; since it has always been held, that the obligation to perform a contract is coeval with the undertaking to perform it. It originates with the contract itself: operates anterior to the time of performance. (*Story Com.* § 1379.) " The remedy, however," says the same author, " acts upon the broken contract, and enforces a pre-existing obligation." (12 *Wheat.* 349–50.)

The judgment of the Supreme Court is placed upon the broad ground, that "such property as was subject to execution when the debt was contracted, must remain subject to the execution until the debt is paid.

This decision therefore, as to the past contracts in fact annihilates the distinction between the contract and the remedy, and applies to the latter the stringent rules which the United States Courts have confined to the former. By this law, one hundred and fifty dollars of property under certain circumstances, is withdrawn from execution, but if the family bible had been for the first time exempted, the decision would have been the same. No degrees are tolerated. The question is not whether the power of the State has been discreetly exercised. The authority to legislate at all is denied, and in truth the decision must be sustained upon this ground.

It is believed that no Court would assume the responsibility of declaring, that in a community where almost every householder sustains the double relation of debtor and creditor, a statute which should withdraw from the mass of six or seven hundred millions of property, the amount limited by this law, for the purposes therein specified, was either impolitic or unjust towards creditors as a class, their interest being alone regarded. An individual deriving any benefit from this law would generally be indebted to more than one creditor. And if the question was submitted to them collectively, whether one of their number should be paid, by a sale of the implements by means of which the debtor was enabled to support himself and family, or whether they should all rely upon his future earnings for the satisfaction of their debts, they, as reasonable men, would be likely to determine it in the spirit of this law. Regulations of this description, says C. J. Taney, have always been considered in every civilized community as properly belonging to the remedy, to be exercised or not by every sovereignty according to its own views of policy and humanity.

It seems to have been overlooked, that this law in its retrospective operation affects the interest of debtors as well as

Danks *v.* Quackenbush.

creditors; and is in fact a modified repeal of all the former exemption acts.    And according to the decision of the Supreme Court in Mathewson vs. Weller, (3 *Denio* 52.) *all* the property of the debtor, is now liable to be sold upon an execution, upon a judgment for the purchase money of any article exempted by *former* laws, as well as the statute in question.

According to this decision, it would be difficult to determine whether in 1842 the amount of property absolutely withdrawn from execution was increased or diminished.

It may be the decisions in Mathewson *vs.* Weller, and in the present case are consistent with each other.  But it seems to me, that unless these constructive obligations are implied only in behalf of the *creditor*, and if the principle be sound, that property not exempt at the *making* of the contract, must remain liable until it is satisfied, the converse of the proposition, that property *then exempt* should *remain* so would also be true.

It is obvious that the effect of the two decisions is, to strip the debtor of an old privilege, in place of conferring a new one upon him.

I have abstained from adverting to the higher considerations which may be presumed to have had their influence with the Legislature in procuring the enactment of the statute.

The interest for example, which every well regulated State has in the maintainance of the family; in the education of those who are to succeed to the rights and duties of citizens; and in preserving the means for maintaining the decencies of life, which are so intimately associated with the moral and religious culture of a people.    Such motives it is granted cannot confer authority, however important in determining its fair and legitimate exercise.    But looking to the effect of this law upon creditors, enlarging their privileges in some respects and restricting them in others, leaving as it does unimpaired all existing remedies in their favor, many of which are in addition to those of the common law, and far more searching and efficacious, and it cannot be said that it leaves to them no substantial remedy.    Still less in the language of C. J.

Taney, are the restrictions of such a character as to make the remedy hardly worth pursuing.

I allude of course to the effect of the law as a whole, not to its operation in especial cases.   It is said that in this case it saves all to the debtor, and it might have been added, that it is equally obvious that the debtor acquired *all* that *was saved,* after the return of the first execution upon this judgment, and for ought we know, of a vendor who may have parted with his property upon the security afforded by the act. These creditors may not gain, but they certainly lose nothing by the law.   But if it were otherwise, it would make no difference.   Every law acting upon the remedy will be productive of some evil.   The objection is not so much to *this* law, as to any legislation whatever.

The Supreme Court, as I understand them, do not deny that this act relates to the remedy, but that the remedy is one over which the State has no power in reference to past contracts.   We are told " that there is no well defined middle ground, between holding that none, or admitting that *all* a debtor's property may by a subsequent law be exempt from execution."

This argument proves too much, for it applies to all retrospective legislation which may by possibility operate upon the contract through the remedy.   The instance of a law regulating the practice of the Courts is not an exception.   Such a law, may direct all actions upon contract to be commenced by capias to be returned within sixty days after the time of service, or any shorter period, and be *valid;* but if it prescribed ten years it would be held unconstitutional.   But in either case, the law would be obnoxious to the objection, that if a State could prescribe sixty days, it might ten years or a longer period, and thus impair the obligation of the contract through the remedy.   There is no well defined middle ground in either case.   The same may be said of statutes of limitations, recording acts, acts abolishing impoisonment for debt, and those giving time to executors, &c., before suit.   The answer to all such objections is to be found in the established

Danks *v.* Quackenbush.

distinction, between the power of the states over the *contract*, and over the *remedy*, between the exercise of a power denied to them by the constitution, and the wrongful exercise of one which they unquestionably possess.   The States may legislate upon *all* remedies ; they must do it, for they have the exclusive power so far as they relate to their own Courts, but they may not abuse that power, in reference to *any* remedy, so far as to destroy the beneficial effects of the contract.   They may therefore exempt the bed of the debtor, but it does not follow that they may a farm worth $20,000.   The first would be a *fair exercise* of authority, the last an *abuse* of it.   If between these extremes, there is no well defined middle ground, it is because our National Court has claimed the right to supervise State legislation upon the subject, not merely by entertaining the question, whether *any* remedy was afforded, but whether a substantial one was provided for the creditor. What is their right and duty is ours, and that of every other Court from the lowest to the highest.

We must enter this terra incognita, explore it by the aid of those lights which experience and the knowledge of the state of society among us will afford, and  determine for ourselves primarily, whether the particular law transcends the limits of fair legislation, and is in *effect*, whatever may have been the motives of its framers, a *fraud* upon the constitution.   We ought not to purchase judicial certainty, by an unqualified surrender of State power.

It is however insisted, that the question is virtually decided by the cases of Bronson vs. Kinzie, (1 *How.* 311,) and McCracken vs. Hayward, (2 *Id.* 608.)   The first was the case of a mortgage executed by Kinzie to Bronson, in which among other things, the former covenants, that if default should be made in the payment of the principal sum and interest secured, it should be lawful for Bronson to enter upon and sell the mortgaged premises at auction, and as attorney for Kinzie convey the same to a purchaser, and out of the monies retain the amount due him, &c.   Subsequent to the execution of the mortgage, the State of Illinois passed a law, in substance pro-

viding, that the mortgaged premises should not be sold except at a sum equal to two thirds of their appraised value, and *when* sold, that the mortgagor should have twelve months within which to redeem; and in his default, his judgment creditors might redeem in three months thereafter. The law was held to be unconstitutional, upon the ground that it deprived the mortgagee of the right to sell the *whole* premises, which was given by the express terms of the mortgage, and second, because it created after sale, a new estate to his prejudice in favor of the mortgagor and judgment creditors. There was therefore a double violation of the contract itself. The case has therefore no application to the present; and as if for the purpose of excluding any such inference, the Chief Justice in his opinion remarks: "That if that law had done nothing more than change the *remedy upon contracts* of that description, it would have been liable to no constitutional objection. For undoubtedly, a State may regulate at pleasure the modes of proceeding in its Courts, in reference to past as well as future contracts." He then instances the statute of limitations, and adds: "that it (a State) may if it thinks proper, direct that the necessary implements of agriculture, the tools of a mechanic, and articles of *necessity* in household furniture, shall, like wearing apparel, not be liable to execution on judgments."

We could almost imagine that the learned judge had our statute before him, while preparing his opinion.

The case of McCracken vs. Hayward, arose under the same law which was passed in February, 1841, and under a section, "that when any execution should be levied on real or personal property, or both, the property should be valued according to its cash value, by three householders on oath, one to be chosen by each of the parties, the other by the Sheriff, who must agree in their valuation, which was to be endorsed on the execution; and when such property should be offered for sale, if capable of division, no greater quantity should be offered, or sold, than would be sufficient to pay the amount of the execution, at two-thirds of the valuation thereof, reserv

ing to the defendant, in all cases, the amount and quantity of property then exempt from execution by the laws of the State."

The property of the defendant was offered for sale by the marshall, but was not sold, as no one bid two-thirds of its value. The plaintiff sued out a new execution, and applied to the Court for an order to sell, regardless of the State law.

The question of the constitutionality of the law did not necessarily arise, as the Circuit Court had not adopted the law of Illinois, which was necessary in order to effect process of execution from that Court. The plaintiff was therefore entitled to the order asked for, and a sale under the former law, which was the law of the Court. But the question *was raised*, and as I infer, decided that the law was unconstitutional. I acquiesce in that decision. It remains to be seen whether it controls the present case.

In the first place, the act was in effect wholly retrospective ; it was passed on the 27th of February, 1841, and applied only to judgments rendered, or judgments that might be rendered, on any contract or cause of action arising prior to the first of May in the same year. Its future operation was limited to two months, and the old law afforded the remedy as to all contracts made after that period.

In the second place, as we have seen, it applied to a *particular class of contracts* and creditors. The act upon its face, therefore, furnished the strongest evidence, that it was adopted as a mere stop law, intended to answer a temporary purpose, and was not, in the estimation of the Legislature who enacted it, in the language of the Court, in Ogden vs. Saunders, "a full, fair, and candid exercise of State power, to the ends of justice, according to its ordinary administration." The judgment of the plaintiff was obtained in 1840. In August, 1842, when his execution was levied, there was one remedy for him, and a more favorable one for a citizen, who contracted with the same debtor, subsequent to May, 1841, and this in reference to the same property.

Nor was this all. The property must be appraised at two-

thirds its value, by *all* the appraisers, of which the debtor selected one. Of course his valuation must be adopted or none.·

But supposing him not to incline in favor of his neighbor, and the property honestly appraised at two-thirds of what would be deemed its value, if taken upon a cash debt. Who that knows any thing of forced sales of property, can suppose that, as a general rule, it would command two-thirds of the real value. If the debt is considerable, the number who have money, in an agricultural community especially, are very few, and in all cases the sale is made without reference to the wants of the purchaser. The sales of securities under the banking law of this State, have not averaged seventy per cent. of their nominal value, and yet the mortgages are secured on lands valued by sworn appraisers at double the amount secured by the mortgage, in addition to the personal security of the mortgagor. What is true with us, would be so in a State possessing far less capital.

The plaintiff's execution, in the case cited, was returned unsatisfied, because no one would bid to the valuation. It would be very extraordinary if it had been otherwise. A different result, under such a law, would have been an exception to a rule nearly universal. It furnishes, in fact, an effectual shield to the whole of the debtor's property. In a word, whether we consider the extraordinary provisions of the law, or its inevitable practical operation, as tested by all experience, it must be condemned as a gross and flagrant abuse of legislative power.

If the law of 1842 is obnoxious to the same objection, let it receive the same condemnation.

But it is incumbent upon those who hold the affirmative, to establish that the statute of Illinois, which legalized all prior exemption acts, and then withdrew the residue of the debtor's property, including his future acquisitions from executions, which was limited mostly to past contracts, and merely suspended the law existing at its passage, for two months after that period, compelling creditors to pursue distinct and une-

Danks *v.* Quackenbush.

qual remedies, according to the date of their contracts, is identical in principle with the law of this State, which deprives the debtor of privileges secured by former laws, and then (when fully paid for) exempts household furniture, tools, &c., of those having families to support, to a limited amount, if adjudged to be necessary by a competent tribunal, which subjects the future earnings of the debtor to the claims of creditors, and compels him, by summary process provided by another law, to apply them in discharge of those claims, and which, above all, instead of being partial and temporary in its operation, was adopted as the settled and permanent policy of a great commercial State, in reference to all contracts, and all persons without distinction.

Until this is done, we may avail ourselves of the rule declared by one of the ablest Judges that ever had a seat in the Court of the United States, "that the positive authority of a decision is co-extensive only with the facts upon which it is made." (12 *Wheat.* 333.)

JONES, JOHNSON, and WRIGHT, Js., concurred with GARDINER, J.

Judgment affirmed.